BOUTALL, Judge.
This suit arises out of two collisions on the Wisner Overpass, a four lane roadway with dividing median, in the City of New Orleans. The night of February 9, 1973 was a cold and stormy one; it had snowed almost all day and ice was forming on many of the city’s overpasses. Juan Cardoza, with his wife and child, attempted to traverse the Wisner Overpass at approximately 8:30 that evening. The Cardoza vehicle failed to get to the crest of the overpass due to its lack of speed and the icy conditions. Being unable to get over the crest and unwilling to back down the slope, Mr. Cardoza simply stopped his car somewhere near the top of the overpass in the right hand lane of Wisner Blvd.
Plaintiff Earl Williams was proceeding along Wisner in the same direction as Cardoza and in the same lane. He testified that he did not see the Cardoza vehicle until he was about 50 feet from the bottom of the overpass. As soon as he realized that the Cardoza car was not moving he attempted to change lanes. However, a car overtaking him in the left lane caused him to stay in the right lane and apply his brakes. The braking of his car caused him to slide on the ice and he collided with Cardoza’s car. Both Mr. Williams and Mr. Cardoza testified that the collision was slight and very little damage occurred to either vehicle. The two vehicles were stopped, one a short distance behind the other, in the right hand lane.
After the collision Mr. Cardoza and Mr. Williams ’talked a few minutes, helped push several other cars over the crest of the overpass, talked to a Park policeman (who promised to call the City Police to the scene), and finally retreated to their respective cars to avoid the biting cold. Williams testified that this entire time his emergency flasher lights were operating.
While seated in his car Williams noticed two sets of headlights approaching from his rear. One set was proceeding very fast and had just passed the other set and changed into his lane. Realizing that the speed at which this car was traveling (estimated at 60 miles per hour) would not allow it to stop in time to avoid a collision, Williams attempted to get out of his car and seek safer ground. Due to the stress of the situation and the fact that- he had inadvertently locked his door, Williams fum.bled several seconds with the door lock and handle. By this time the car was upon 'him, smashing him from the rear and sending his car careening across the left lane, coming to rest straddling .the median of the four lane bridge.
After the collision Williams went back to the car that had hit him only to discover that it was a taxicab containing two people. He talked to the driver and smelled a strong odor of alcohol on his breath. The passenger appeared injured and also smelled of alcohol. The facts of the accident and the condition of the taxicab driver as testified to by Williams are corroborated by the testimony of Cardoza.
Williams further testified that he became nervous and upset following this second accident and that when he finally got home and calmed down he started to feel pain in his neck and back. This pain was later diagnosed as a muscle injury along the cervical and lumbar spine from which Mr. Williams recovered after several months of treatment.
The version of the accident as recounted by Mr. Timphony, the driver of the taxi *577 cab, is very different from that of Mr. Williams and Mr. Cardoza. Timphony was at the time employed by the Fair Grounds racetrack as a pari-mutuel clerk. He stated that at the close of racing on February 9, 1973 two friends came to him and asked him to drive them to certain places, because they were both very intoxicated. Timphony agreed and so from 5:30 P.M. until 8:30 P.M. the three of them went to two barrooms and dropped off one of the friends. At each bar Timphony consumed one beer, for a total of two beers before the accident. Timphony stated that he was going to take his other friend home as he approached the Wisner Overpass at about 8:45 P.M.
Mr. Timphony describes the accident in the following way: It was very dark and cold, visibility was poor due to snow falling. He was driving approximately 20 to 22 miles per hour in the left hand lane on the overpass as he reached the crest. On the other side of the crest, at a distance of 30 feet, was an object in his lane which he could not identify. By the time that he saw it was a car straddling the median it was too late and he smashed into the left rear quarterpanel of the car. The force of the impact did two things; it caused his car to veer to the right and come to rest in the right hand lane a short distance behind Mr. Cardoza’s car. As to the car on the median it did nothing, that car didn’t move at all. He states that right after the accident he saw two people running away on the overpass.
Mr. Williams sued Mr. Timphony, the cab company and its insuror. The defendants answered and made a third party demand upon Mr. Cardoza. In the consolidated case Mr. Williams’ automobile insurance company sued the defendants for the money it expended to fix Mr. Williams’ car. The trial court rendered judgment for both plaintiffs and dismissed the defendants’ third party demand against Mr. Cardoza.
The defendants, on appeal, assign as error the failure of the trial court to hold Mr. Williams contributorily negligent; also, they feel Mr. Williams failed to prove that his injuries resulted from the second accident. We will take each contention in order.
CONTRIBUTORY NEGLIGENCE
Defendants contend in this Court that LSA-R.S. 32:141[1] is applicable to this case and the trial judge failed to give it effect. We first note that this is a state law applicable to state highways as part of the Highway Regulatory Act. LSA-R.S. 32:41 grants local municipal authorities power to regulate the standing or parking of vehicles on other than state maintained highways. Defendants have also pleaded the traffic ordinance of the City of New Orleans, and absent proof that this is a state maintained highway, the controlling law seems to be New Orleans City Code, 1956; § 38-131 (b) which sets out the duty to warn other traffic of one’s disabled car. The basic issue is, did Mr. Williams discharge *578 his duty to warn oncoming traffic of his disabled vehicle?
The widely divergent stories of the two parties presented the trial judge with a clear decision. If Mr. Williams and his witness, Mr. Cardoza, were to be believed then Williams discharged his duty by having his flashers on. An oncoming driver that was keeping a proper lookout would have seen the disabled cars and thus have avoided the accident. Agnello v. Allstate Insurance Co., 252 So.2d 538 (La.App. 4th Cir. 1971); Lawrence v. Winn-Dixie Louisiana, Inc., 208 So.2d 329 (La.App. 3rd Cir. 1968). On the other hand if Mr. Timphony is to be believed the situation created a trap for him and this trap required Williams to do much more than he did to discharge his duty of care. Laird v. State Farm Insurance Co., 290 So.2d 343 (La.App. 4th Cir. 1974); Casagrande v. Roullier, 267 So.2d 260 (La.App. 4th Cir. 1972).
It is obvious that the trial court believed Mr. Williams and Mr. Cardoza. The only other witness was the investigating police officer, however, his testimony is of little value since there were glaring inconsistencies between his testimony in court and the report he filled out at the time of the accident. It does not require citation that the trial judge is the best judge of credibility of the witnesses. We find no error in his credibility decision.
DAMAGES
The defendants contend that there is not sufficient evidence to conclude that Williams’ injuries resulted from the second accident. We hold that the following facts show that it is more probable than not that Mr. Williams was injured in the second accident and not the first.
The impact of the first collision was described as slight by both parties involved. The second collision was described as taking place at great speed, doing almost all the damage to the Williams’ car and having a heavy impact. Mr. Williams testified that he braced himself for the first collision because he knew it was coming. He was unbraced for the second collision because he was trying to get out of his car. Dr. Braud, plaintiff’s physician, testified that Mr. Williams had a flexion-extension type injury of the cervical and lumbar spines. Following the first accident he felt no pain and in fact engaged in the strenuous activity of pushing cars over the crest of the overpass.
For the above reasons we affirm the judgments of the trial court at appellants’ cost.
Affirmed.

. “§ 141. Stopping, standing or parking outside business or residence districts
“A. Upon any highway outside of a business or residence district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway.
“B. The provisions of this Section shall not apply to the driver of any vehicle which is disabled while on the main traveled portion of a highway so that it is impossible to avoid stopping and temporarily leaving the vehicle in that position. However, the driver shall remove the vehicle as soon as possible, and until it is removed it is his responsibility to protect traffic.
“C. The driver of any vehicle left parked, attended or unattended, on any highway, between sunset and sunrise, shall display appropriate signal lights thereon, sufficient to warn approaching traffic of its presence. Acts 1962, No. 310, § 1.”